**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -v- | ) | No. 12 CR 109 |
| | ) | |
| HEON SEOK LEE, | ) | Hon. Sharon Johnson Coleman |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL**
**And RULE 34 MOTION FOR ARREST OF JUDGMENT**

NOW COMES the Defendant, HEON SEOK LEE, by and through his attorneys, MONICO & SPEVACK, and moves pursuant to Rule 29 of the Federal Rules of Criminal Procedure for a judgment of acquittal notwithstanding the verdict. In addition, Defendant moves pursuant to Rule 34 of the Federal Rules of Criminal Procedure for Arrest of Judgment.

IN SUPPORT of this Motion, Defendant re-raises and restates the arguments made in his Rule 29(a) motion for acquittal at the close of the Government's case. As Defendant argued in his motion at the close of the Government's case, the Government failed to prove that substantial transformation did not occur in the United States. The Government incorrectly assumed that because the blowers were fully assembled when they arrived in the United States they could not meet the substantial transformation test. The Government offered no evidence that substantial transformation was not done in the United States subsequent to entry, when in fact the blowers required set-up and programming that met the test for substantial transformation under EPA guidelines.

IN FURTHER SUPPORT of this Motion, Defendant states:

1

1.      A core thread of disconnect coursed through this case.  Defendant founded his

defense basically on the fact that the American Recovery and Reinvestment Act ("ARRA") and

its "Buy American" requirement, did not (and does not) apply to him and company, KTURBO.

Defendant pointed out, and as the Government did not disagree, he proved that he did not

contract with any of the municipalities listed in the Indictment.  Further he argued and proved

that he was neither a recipient nor a sub-recipient of "Buy American" stimulus funds.[1]  There is

no disagreement in this case that Defendant did not enter into any contracts with any

municipalities or the United States.  Defendant's only representations – that he would comply

with ARRA – were made in the context of his contractual obligations to contractors and not as

part of any contractual promises to municipalities or the United States.  And payments made for

goods or services provided to contractors do not constitute federal awards. *See* 2 CFR §

910.501(f). *See also* 2 CFR § 200.92 ("Subaward means an award provided by a pass-through

entity to a sub-recipient. … It does not include payments to a contractor …"); 78 Fed.Reg.

78590 (Dec. 26, 2013) (contractor and vendor are synonymous).  In other words, contractors,

much less vendors like KTURBO, are not subject to the compliance requirements of federal

programs merely because they contracted with someone who was. *See* 2 CFR § 200.330(b).  And

as contractors themselves are independent from the municipalities, they are not agents of the

municipalities and statements made to them are not being made to the municipality.

---

[1] The "Buy American" provision, section 1605(a), states generally that funds made available under the
provision may not be used for the construction of a public project unless all of the manufactured goods
used in the project are produced in the United States.  KTURBO did not receive and thus was not a
recipient of stimulus funds.  KTURBO did not qualify as a "subrecipient," which is defined as a legal
entity accountable to the recipient for the use of the funds provided. *See, e.g.,* 15 CFR § 14.2(jj).
KTURBO was merely a vendor hired by the contractor.  KTURBO was hired and paid by a contractor to
do specific work on a project.  The responsibility for ARRA and Buy American compliance fell on the
parties who received the stimulus funds.

Because KTURBO was not subject to ARRA, there was no fraud, and evidence about matters such as "substantial transformation" were irrelevant, as the Court recognized during the discussion of the jury instructions. ("So if you are saying substantial transformation on one hand, but then claiming that your client isn't subject to ARRA, ... then substantial transformation makes no difference." Tr. 1563).[2] But because KTURBO was not subject to ARRA, it did *not* have to comply with any of the regulations and there could be no fraud. There is no dispute as to any of these facts, and judgment should be entered for the Defendant on all the counts.

The Government, of course, sees the case differently. The Government argues this is a wire fraud case, not a contract case, and the only issue was whether Defendant made false statement *to anyone* that led the to the release of stimulus funds on particular waste water projects. On several occasions the Court has rejected the Defendant's argument and agreed with the position of the Government. The Court made multiple rulings predetermined by this view of the case.

Defendant respectfully re-raises the arguments he has made with respect to the non-application of the ARRA to the facts of this case. If KTURBO was not subject to ARRA, then it is hard to conceive how Defendant could have committed a crime. There was no evidence Defendant made *any* statements, false or otherwise, to any municipality that received Government funds. "Recipients" under ARRA promise to use the money to buy American made goods; KTURBO was a vendor manufacturer. There was no evidence that Defendant knew when he contracted with the project contractors that the Government was going to rely on anything he said with respect to an intent to provide blowers that were ARRA compliant when

---

[2] As argued later in this motion, the fact is that KTURBO met the requirements of substantial transformation anyway, an additional basis for vacating the jury verdicts and entering judgments of acquittal.

the time came for delivery. Defendant basically promised the project contractor that KTURBO would comply with the law. While several KTURBO employees expressed concerns that KTURBO was violating the law by importing fully assembled blowers from Korea, their misapprehensions over whether ARRA applied has no evidentiary value. Their testimony does not make something true when in reality it wasn't.

But even *if* KTURBO had some responsibility under ARRA, the evidence presented in the case supports Defendant's reasonable belief he did not, and supports the conclusion that he lacked the specific intent required to violate the wire fraud statute. *See United States v. Hikock*, 77 F.3d 992, 1003 (7th Cir. 1996) (mail and wire fraud ae specific intent crimes). Defendant received payment from the contractor for goods he delivered that the contractor was going to use in a larger project. By the time Defendant received payment any Government funds had become the property of the contractors who paid him for the work he performed.

Moreover, the proper time for identifying fraudulent intent is contemporaneous with the making of the promise, not when a victim relies on the promise or is injured by it. Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation. *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016). The false statement must have been at the time a willful act by the defendant with specific intent to defraud or cheat. *United States v. Duff*, 464 F.3d 773, 786 (7th Cir. 2006). As the Indictment itself makes clear, Defendant's statements that KTURBO intended to comply with ARRA were communicated in a six-month period between January 2010 June 2010. *See* Ind. Ct. I, ¶12; Ct. II, ¶2; Ct. III, ¶2; Ct. IV, ¶2; and Ct. V, ¶2. The alleged "smuggling" occurred at least six months after the last alleged "false" statement, in January and February 2011, *See* Ind. Cts. VI, VII, and VIII. The evidence was clear that Defendant intended

4

to set up a plant that would enable him to comply with ARRA's "Buy American" requirements, so at the time he made the statements– which were nothing more than he *intended* to comply – he was truthful. For that reason as well, assuming for the sake of argument that ARRA applied the Government still failed to prove specific intent to violate the wire fraud and smuggling statutes beyond a reasonable doubt. Defendant of course submits that KTURBO was not subject to ARRA at all and that his certification was just a contract term and not a false statement made to a municipality or the United States.

The *Countrywide* case is similar. Defendants were charged with wire and mail fraud civilly for selling mortgages to government sponsored entities that they knew were of poor quality. The Government adduced no evidence that the defendants had fraudulent intent at the time of the negotiation or execution of the contracts. *Countrywide Home Loans, Inc.,* 822 F.3d at 654. The Court held that wire fraud required the false statements to have been made knowingly at the time they were made and vacated the adverse verdicts. *Countrywide* is not materially different from what happened here.

The Government argued that Defendant violated the wire fraud statute based on his promise to comply with the law. But *if* there needed to be "substantial transformation" on Defendant's part, there was, and therefore Defendant *did* comply with the law and there was no fraud.

The Government's effort to divorce this prosecution from ARRA by framing it as a wire fraud case should have been rejected by the Court throughout the proceedings and should be rejected by the Court now. Wire fraud requires the Government to prove a fraudulent "scheme." There could be no scheme outside the parameters of ARRA. If ARRA did not apply, a scheme to defraud could not exist. Any alleged "false statements" could not be material. *See, e.g.,*

5

*United States v. Henningsen,* 387 F.3d 585, 589 (7th Cir. 2004) (Seventh Circuit has long held

materiality an element of a scheme to defraud). As ARRA did not apply, a scheme to defraud

did not exist, and orders of acquittal should be entered on all counts.

      2.      The Court should enter judgment in favor of the Defendant based on a plain

reading of the ARRA's "Buy American" provision. An ordinary person reading the Act and its

implementing regulations would conclude the Act does not apply to manufacturing goods

imported from the Republic of Korea.

      Specifically, ARRA section 1605 provides that ARRA funds may not be used to fund

construction of public work projects unless the manufactured goods used in the project "are

produced in the United States." Pub. L. 111-5, § 1605. The implementing regulations issued by

the Office of Management and Budget ("OMB") state:

> **(ii)** Section 1605(d), which requires application of the Buy American requirement in a
> manner consistent with U.S. obligations under international agreements. *The restrictions
> of section 1605 of the Recovery Act do not apply to designated country iron, steel, and/or
> manufactured goods.* The Buy American requirement in section 1605 shall not be applied
> where the iron, steel or manufactured goods used in the project are from a Party to an
> international agreement that obligates the recipient to treat the goods and services of that
> Party the same as domestic goods and services. As of January 1, 2010, this obligation
> shall only apply to projects with an estimated value of $7,804,000 or more.

2 CFR 176.160(b)(1)(ii) (emphasis added). As is readily apparent, the Act's restrictions do not

apply to manufactured goods from a "designated country." CFR section 176.160(a)(1) identifies

the Republic of Korea as one of the "designated countr[ies]" to which the section applies.

Plainly, as Korea is a "designated country" under the Act, and as designated countries are

exempt from the Buy American requirements, then Defendant could not as a matter of law have

violated the Act. Moreover, because KTURBO had no obligation to comply with the Act

Defendant's alleged false statements could not have been material.

6

Defendant could not violate the Buy American provision of the American Recovery and Reinvestment Act ("Recovery Act") as a matter of law. Consequently, whether he allegedly lied when he or his company certified compliance with the Act could not have impacted the Government's decision to release stimulus funds in the various projects at issue and his convictions should be vacated and acquittals entered in his favor.

3.      Even if the Court rejects the plain reading of the provision discussed above, the implementing regulations do not apply to the circumstances of this case either. Once again, the regulations state:

> **(ii)** Section 1605(d), which requires application of the Buy American requirement in a manner consistent with U.S. obligations under international agreements. The restrictions of section 1605 of the Recovery Act do not apply to designated country iron, steel, and/or manufactured goods. *The Buy American requirement in section 1605 shall not be applied where the iron, steel or manufactured goods used in the project are from a Party to an international agreement that obligates the recipient to treat the goods and services of that Party the same as domestic goods and services.* As of January 1, 2010, this obligation shall only apply to projects with an estimated value of $7,804,000 or more.

2 CFR 176.160(b)(1)(ii) (emphasis added).[3]

Prior to trial the Government agreed "that the Buy American requirement was not to be applied where the … manufactured goods were from a party to an international agreement that obligated the recipient to treat the goods and services of that party the same as domestic goods and services." *See* Gov't Reply in Support of Motion to Admit Evidence, Doc. #125, at PageID #995. It also agreed that South Korea qualified as a "designated country," under the World Trade Organization Agreement ("WTO"), which required the United States to treat Korea's product as domestic goods when procuring such goods. *See id.*, at PageID #995-96, *citing*

---

[3] The regulation is not a model of clarity, but Defendant submits that a sensible reading of the statute leads to the conclusion that the preceding sentence (exempting purchases from designated countries) has no relation to the instant sentence (exempting purchases from countries with certain international agreements). Defendant thus discusses them separately.

7

McNiff, *The Use of Federal Grant-Making Power to Expand State and Local Procurement Coverage Under the Transatlantic Trade and Investment Partnership,* 44 Pub.Cont.L.J., 327, 332-33 (Winter 2015). While these facts would lead an average person to conclude the Recovery Act does not apply, the Government claimed that when the United States entered into the WTO Government Procurement Agreement only thirty-seven states agreed to grant parties access to some of their procurement markets, and those states reserved the right to discriminate against foreign contractors on public utilities projects, such as those at issue in this case. *Id.,* at PgID #996, *citing* McNiff at 332-33. The Government claimed further that none of the municipalities at issue in the instant case were parties to the WTO Government Procurement Agreement and therefore that agreement was not in effect for purposes of the projects in this case. *Id.,* at PgID #996.

Statutes and regulations need to be clear on their face, and the statute and regulations here state simply that WTO agreement countries, of which Korea is one, are not subject to the Buy American requirements of the Recovery Act. The provisions should not be applied in a manner that sets a trap for the unwary. Once again, Defendant could not have violated "Buy American" requirements through the shipment of the blowers. Because he could not as a matter of law have violated the requirements, his alleged false statement was not material, and therefore judgments of acquittal must be entered on all the wire fraud counts.

4.      Assuming the Court does not direct verdicts on the wire fraud counts based on the failure to show a crime, the evidence itself was still insufficient. Although the Court restricted Defendant's ability to substantively argue "substantial transformation" – rejecting Defendant's request even for an instruction on the issue (and hence an issue Defendant raises separately in his motion for a new trial) -- there was enough evidence in the trial to find as a matter of law that the

8

evidence established KTURBO had performed substantial transformation or, more pointedly, that the Government failed to establish that KTURBO did not.

As a threshold matter, it was error to conceive of the "project" in this case as nothing more than KTURBO delivering a turbo to someone. The "project" was a public works project that *included* a turbo that the contractor purchased from KTURBO. There is no requirement with regard to the origin of components or subcomponents in manufactured goods used in a project as long as the manufacturing occurs in the United States. 2 CFR 176.70(a)(2)(ii). The waste water treatment plant was the "project," and it included the turbo that had been assembled in Korea, but the "project itself was manufactured *entirely* in the United States.

But even looking at the turbo as an isolated "manufactured good," judgments of acquittal must still be entered. The Government argued essentially that Defendant violated the ARRA because the blowers were "substantially *assembled*" in Korea, but substantially assembled is not the same thing as substantially "transformed." The EPA has infused that latter phrase with a definition that was clearly met in the circumstances of this case, and upon which Defendant was entitled to rely. *See* Ex. A, Substantial Transformation Test. There can be no dispute about the importance of the EPA guidelines on "substantial transformation" to the circumstances of this case. The Government cites to it in the Indictment. *See* Ind. ¶1g.

Right from the beginning the Government misled the Grand Jury and ultimately the petite jury by suggesting substantial transformation could not exist where the goods were imported "preassembled" outside the United States. The concept of "substantial transformation" is in fact unconstitutionally vague based on the confusing definitions on this point. Although regulations define substantial transformation of manufactured goods from a foreign country in terms of transforming something "into a new and different manufactured good distinct from the materials

from which it so transformed," 2 CFR § 176.160, the EPA guidance on "substantial

transformation" requires noticeably and materially less. It was only by turning a blind eye

towards, and by effectively hiding the Grand Jury from the more liberal interpretation of

"substantial transformation" that the Government was able to obtain an indictment.

In fact, "substantial transformation" is met if the importer can satisfy one of three (3) tests,

basically a series of questions a member of the public could answer to determine whether there

was substantial transformation in a particular case. *See* Ex. A, Substantial Transformation Test.

The witnesses from the EPA, Andrew Bielanski (Tr. 98-99) and Deborah Baltazar (Tr. 56-57),

both acknowledged that the EPA had published this guidance for very purpose of helping the

public measure whether substantial transformation had occurred.

One of those tests for substantial transformation asks whether the process or processes,

including but not limited to assembly, performed in the United States were complex and

meaningful. [4] The complex and meaningful process thus includes the process of assembly (a

factor the Government has tried to fudge as far back as the Grand Jury when it elicited from its

witnesses the misleading fact that the blowers simply has been "assembled" in Korea as if that

fact in and of itself negated substantial transformation). To answer that threshold question, EPA

guidance proposes five subsidiary questions, a positive answer to two of them being sufficient to

qualify as substantial transformation. Those questions include whether the processes in the

United States took a substantial amount of time, and according to Government Exhibit 805, for

example, which is the contract between KTURBO and West Bay Builders on the Millbrae,

California project, KTURBO was required to, among other things, be ready to perform factory

and field training, start-up requirements, devote a minimum of three (3) days on site services for

---

[4] The actual language in question 3 is: "Was (/were) the process(es) performed in the U.S. (including but not limited to assembly) complex and meaningful?

testing, start-up and training, furnish and install a power consumption reading device of each blower to measure the consumption of electricity, insure that each blower drains electricity immediately following shut-down, among other things. Other contracts similarly expected KTURBO to provide on-site testing as well. *See, e.g.,* Gov. Ex. 1002. Another question asks whether the processes were costly or whether the processes required high-level skills. There was costly and timely programming, calibration and testing that had to be performed by highly skilled personnel. (Tr. 302). Meanwhile, the cost of the turbos included set up. The turbos could not simply be dropped off on the curb ready to be plugged in and operated.

The Government's expert, Pavel Hajda, confessed he did not himself know how to set up the turbo blowers once they arrived in the United States or at the job site, but agreed the blowers were "complex," had to be installed and calibrated, and that these things were not the sort of things any member of the public could accomplish. There were significant initialization steps. Hajda conceded that he could not install, test, calibrate, and program the turbo blowers. (Tr. 302-05).

It is important to pause and note here that the "substantial transformation" test described above asks questions focused not merely on assembly, but on processing, onsite assembly, and integration of the components into the finished good. The municipality in these matters engaged contractors to work on waste water projects, one aspect of which included a turbo blower that would be used to clean the water. In effect, the municipality ordered a process from the contractor of which the turbo blower was an integral part. The blower was integrated into the project and delivered to the municipality as a part thereof. That's why it was the municipality, as recipient of the "Buy American" funds, that had the responsibility for determining whether the *project*, which included the turbo blower, complied with whatever requirements existed if the

11

municipality (not KTURBO) wished to receive stimulus funds. Section 1605 does not regulate manufacturing, it regulates buying, meaning recipients of goods must comply with the Buy American Act when they buy products. KTURBO was not a recipient and therefore under no obligation to "manufacture" blowers in compliance with the ARRA or the Buy American provisions.

As noted, the "complex and meaningful process" includes set-up. Deborah Baltazar, the Government's EPA witness, testified this process can occur at the jobsite. Setting up the turbo blower and preparing it to work was both a critical part of the process of installing a complex mechanical product and including it as part of a larger public works project manufactured ultimately in the United States.

The Government also elicited through its examination of Baltazar that the EPA says it does not and will not take a position on whether substantial transformation took place on a particular project. The EPA's stance reinforces the necessity to construe the substantial transformation test in a liberal manner, as opposed to a way that penalizes someone who reads the words of the EPA guidance only to be told, in retrospect, the EPA now disagrees.

Unlike the EPA who, after setting forth criteria to determine whether "substantial transformation" exists, runs away and tells recipients they can now just fend for themselves, the United States Customs and Border Protection ("CBP"), which has authority under the Trade Agreements Act ("TAA"), has created *some* precedent for applying the "substantial transformation" test. It has stated the factors are not exclusive and other factors may be determinative. *Hampton Products International Country of Origin Marking of Locking Apparatus,* HQ 734440 (Mar. 30, 1992). Among the factors CBP looks to are testing, calibration, and programming operations. *See, e.g., Hampton* (testing, calibration and

programming operations); *Final Determination of Country of Origin of Certain Bowling Pinsetters*, HQ 563583 (Feb. 13, 2003) (processing of the product at end-user facility that required precise calibration); *Final Determination of Country of Origin of Certain Optical Spectroscopy Instrument Systems*, HQ 735315 (Apr. 10, 1995) (extensive calibration). Those are the sorts of things performed on the KTURBO blowers here.

Returning to the EPA guidance: Because in this case at least two questions could be answered in the affirmative, "substantial transformation" as understood under the law did occur. It was a requirement of the contracts. Rather than present that testimony the Government led the Grand Jury to believe this case involved nothing more than "simple assembly." The Government did not allow the Grand Jury to make an informed probable cause decision. The evidence at trial established KTURBO entered into contracts that contemplated and required substantial transformation and that substantial transformation took place and therefore the Defendant established compliance with the "Buy American" provision as a matter of law, so a judgment of acquittal should be entered. The case is no different than if the jury had been asked to answer those questions directly, in which case their positive answers would have made clear that substantial transformation occurred. The Court should enter an Order dismissing the Indictment.

5.      For many of the reasons stated above, it seems clear that the term "substantial transformation" is unconstitutionally vague and cannot be a valid basis upon which to rest a criminal conviction. EPA guidelines contradict any notion that the Act requires a complete transformation of a product into a wholly different one, unrecognizable from the original, as the guidance requires action significantly short of that. Under no circumstances should a person be placed in jeopardy when one of the underlying questions turns on whether he accomplished "substantial transformation," given that satisfactorily complying with EPA guidance might not

be enough to comply with the ARRA. This makes the statutory scheme unconstitutionally vague and Defendant's Indictment should have been dismissed.

The Fifth Amendment provides no person shall be deprived of life, liberty, or property without due process of law. The Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. *Johnson v. United States,* 135 S.Ct. 2551, 2556 (2015), *and citing Kolender v. Lawson,* 461 U.S. 352, 357-58 (1983). In the instant case the statutes at issue, such as the wire fraud statute, are not in and of themselves vague, but they become vague when the basis for the prosecution under them stems from a vague regulatory scheme as exists here.

An ordinary person reading the EPA guidance in conjunction with the regulations would be hard-pressed to determine when "substantial transformation" exists. Moreover, the tests offered by the EPA to help an ordinary person determine whether he has substantial transformation are unconstitutionally vague within themselves. Like the residual clause stricken as unconstitutional in *Johnson*, the EPA guidance leaves "grave uncertainty" about how to estimate the risk posed when the Government employs it to prosecute a crime. *Johnson*, 135 S.Ct. at 2557. For instance, the third test, which was in issue here, states that an affirmative answer to two of five questions qualifies a product as having been substantially transformed in the United States:

     a.    Did the process(es) take a substantial amount of time?
     b.    Was/were the process(es) costly?
     c.    Did the process(es) require a number of different operations?
     d.    Did the process require particular high level skills?
     e.    Was substantial value added in the process(es)?

According to the EPA guidance, these factors focus on manufacturing, processing, assembly or integration of the components into the finished good. But how does one determine whether the process(es) took a "substantial" amount of time? How much time is "substantial"? And how does one decide whether the process(es) qualify as costly? Is it based on pure cost, or is it based on percentage to the entire project? The same questions can be asked with respect to the other questions. They are simply too nebulous for an ordinary person to know when the elements are met and substantial transformation for their product has occurred.

Consequently, a criminal prosecution based in whole or in part on whether substantial transformation occurred violates due process. Defendant's convictions should be vacated and the Indictment dismissed.

6.     The Government failed to meet its burden on Counts 6 through 8 of the Indictment, which charged Defendant with violating 18 U.S.C. § 545. The Government had to prove the following elements beyond a reasonable doubt: (1) Defendant imported or brought into the United States merchandise; (2) the importation or bringing into the United States of the merchandise was contrary to law; and (3) Defendant acted knowingly or fraudulently. The Government failed to prove that importation of the turbo blowers was "contrary to law." Specifically, the Government charged Defendant, who was ultimately convicted by jury, of violating 19 U.S.C. § 1304 "Marking of imported articles and containers," which requires that articles of foreign origin be marked in a "conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit."

The evidence was that the articles *were* marked. According to the Indictment and the Government they were marked "Assembled in the USA." The statute proscribes *non*-marking, not *mis*-marking. The accompanying papers plainly indicated the articles originated in Korea.

15

The statute was not violated by the *mis*-marking and clearly there was no intent to violate the statute given the fact that the papers accompanying the shipments identified they had been imported from Korea.

Moreover, the federal regulations under 19 C.F.R. § 134 define the various terms relating to section 1304. "Country of origin" under 19 C.F.R.§ 134.1(b) is defined as "the country of manufacture, production, or growth," adding "[f]urther work or material added to an article in another country must effect a substantial transformation in order to render such other country the 'country of origin' within the meaning of this part." *See* 19 C.F.R. §134.1. Section 134.35 provides further explanation of "[a]rticles substantially changed by manufacture." A manufacturer or processer in the United States who manufactures an imported article, which results in an article having "a name, character, or use differing from that of the imported article," has substantially changed the imported article. *See* 19 C.F.R. § 134.35(a).

In defining the "ultimate purchaser," or who last receives the article in its imported form, the federal regulations provide some direction through example. Section 134.1(d)(1) states, "the manufacturer may be the 'ultimate purchaser' if he subjects the imported article to a process which results in a substantial transformation of the article, even though the process may not result in a new or different article." Where a manufacturer or processer may be the "ultimate purchaser," the article will thus be exempted from marking. *See* 19 C.F.R. § 134.35(a) and *In re Property Seized from ICS Cutting Tools*, 163, F.R.D. 292, 296 (E.D.Wis. 1995).

As defined under section 134.1(d)(1), Defendant and KTURBO USA were the ultimate purchasers of the blowers in their imported form, and thus exempt from marking. At no time was the importation of the turbo blowers contrary to law. But even if the blowers were subject to certain marking under 19 U.S.C. §1304, the blowers were subsequently substantially transformed

16

in the United States. Although the Government proved the blowers were substantially assembled in Korea, the Government failed to show that substantial assembly equals substantial transformation. The two concepts are not mutually exclusive. Items substantially assembled in a foreign country can be substantially transformed in the United States. This is precisely the case here. The turbo blowers were assembled abroad, but were substantially transformed in the United States through the programing and calibration processes.

The process of installing, calibrating, and programing the blowers subjected the blowers to substantial transformation by Defendant and KTURBO USA, even though it did not necessarily result in a new or different article. Moreover, Special Agent Lambert testified that the one of the seized blowers had "Made in Korea" labeled on the power switch (*See* Trial Transcript p. 181). This labeling, which was clear and permanent, of "Made in Korea," proves that even if Defendant and KTURBO were in violation, there was no intent to defraud the Government. Therefore, the Government failed to meet its burden beyond a reasonable doubt on Counts 6 though 8.

7.     The Court erred when it denied Defendant's Motion to Dismiss the Indictment Based on Misleading Grand Jury Testimony for the reasons stated therein and above. *See* Doc. #83, Page ID #350. *See also* Doc. #99, PgID #661; Doc. #109, PgID #109-1.  Defendant re-raises those arguments here.  Among other things the Government misled the Grand Jury as to concept of "substantial transformation," never explaining the EPA guidance and how that could impact on whether Defendant in fact had committed a crime.  Although the Government is not required to submit exculpatory evidence to the grand jury, *United States v. Gardner,* 860 F.2d 1391, 1395 (7th Cir. 1988), it may not present false testimony. *Napue v. Illinois,* 360 U.S. 264 (1959).  However, where the legal instructions to the grand jury seriously misstate the applicable

law, the indictment is subject to dismissal if there is grave doubt that the decision to indict was free from the substantial influence. *See, e.g., United States v. Stevens,* 771 F.Supp.2d 556, 567 (D.Md. 2011), *citing, e.g., Bank of Nova Scotia v. United States,* 487 U.S. 250 (1988). The Indictment was improperly returned. The District Court thus lacked jurisdiction to try this case and the error affected both the wire fraud and smuggling counts in the Indictment.

The Grand Jury was led to believe that if a product was "substantially assembled" overseas then it *cannot* be "substantially transformed" in the United States.[5] That is not true. Further, the Grand Jury was never told that there is guidance on the term so that Grand Jury indicted based on the fallacy that 1) all KTURBO did was "simple testing," and 2) that simple testing wasn't enough. Kept from the Grand Jury was that KTURBO was required to do more than simple testing, and that what KTURBO did complied with the guidance. This was an abuse of the Grand Jury process and permeated both the wire fraud and smuggling counts in the Indictment.

REDACTED
GRAND JURY
TESTIMONY

known that KTURBO's only certifications were provided to contractors, and even there KTURBO only expressed intent to provide ARRA approved product in the future.

REDACTED GRAND JURY TESTIMONY

pages 10-11, *supra*, and second because the EPA's published guidance on the question of "substantial transformation" does not, as the naked phrase may imply, require transforming the product into something different. The Government led the Grand Jury to infer that *all* KTURBO did was required to do was "test" the item, and that testing was not enough. The Government made the decision to keep the Grand Jury in the dark about what constitutes "substantial transformation" and prodded the jurors to assume that all KTURBO did was test the machines and that testing the machines was not enough.

The facts summarized above make clear the Government obtained its Indictment by misleading the Grand Jury with respect to critical facts. The Government did not meaningfully explain the concept of "substantial transformation;" it led the jury to believe that "simple testing" is all that occurred and ignored what the contracts KTURBO entered actually required; it elicited ███████████████████████████ o that products had to be manufactured in America in order to meet ARRA requirements; it allowed its agents to testify that KTURBO

provided certifications to each city identified in the Indictment when in fact KTURBO provided *no* certifications to *any* cities but instead made promises *to contractors* that it would, in the future, comply with ARRA provisions. The Government offered facts like these, and others as described in Defendant's several motions to dismiss the Indictment, when none of them were true and the Government would have known they were not.[6] The Government elicited this misleading and arguably false testimony but did nothing to correct it in its zeal to obtain the Indictment. For this reason as well the convictions must be vacated and judgments of acquittal entered.[7]

8.      The Court erred when it denied Defendant's motion to dismiss the case based on invalidity of the indictment under both Rules 29 and 34. *See* Doc. #97, PgID #613. Defendant re-raises the arguments made therein. Among other things the EPA is not a decision-making body, Defendant is not a recipient under ARRA, and mislabeling is not smuggling.

9.      The Court should dismiss the Indictment based on misleading testimony provided to the Republic of Korea with respect to extradition. After extradition, the Government changed facts and thus tried Defendant under theories different from those that led the Republic of Korea to agree to extradition.

According to the Seoul High Court's Decision on Extradition (Ex. F), among other things the Court relied upon statements by former KTURBO employees Joel Schomo (Ex. B) and John Jansouzian (Ex. E). Although the ruling did not cite to these facts specifically, it specifically

---

[6] Defendant's motion to dismiss contained other alleged misstatements, such as that KTURBO gave Buy American certificates to municipalities when they were in fact given to contractors and that section 1605 *requires* goods purchased with ARRA funds be made in the United States when it only requires "substantial transformation."

[7] This also affects the "smuggling" count because under 19 USC 1304 articles of foreign origin must identify the "ultimate purchaser." If KTURBO substantially transformed the product then it was the ultimate purchaser.

relied upon those statements in granting extradition. In each of those statements the affiants described the turbo blowers as "assembled," which is not the same thing as "transformed." So did Kim Woelffer. ("I told Heon Seok Lee … that shipping completely assembled blowers … was not substantial transformation and did not meet Buy American requirements.") Moreover, based on what the Court was told by the Government through the attached Indictment it was led to believe that KTURBO supplied turbo blowers directly to wastewater treatment facilities when in fact the only contracts KTURBO entered were private contracts to sell product to contractors. Korea found an extraditable offense of fraud because KTURBO entered into "supply contracts for turbo blowers … with … local governments," (Ex. F), when in fact KTURBO only made certifications of future intent not to cities but to independent contractors. Subsequent to extradition the Government dismissed a critical allegation in the Indictment that it had provided Korea, that Defendant "intended to fraudulently obtain Recovery Act stimulus funds in excess of $1,337,189." Ind., ¶10. After presenting evidence to the jury the Government successfully moved to dismiss that allegation.

Korea agreed to extradition in the belief that Defendant attempted to swindle money from six local governments (1) through fraud by entering into supply contracts for turbo blowers with the local governments based on false certifications the products or their core processes had been performed in the United States, and providing false certificates that Korean products had been manufactured in the United States or their core processes had been performed in the United States; (2) through online fraud by emailing performance bonds to waste water treatment facilities falsely prepared as if the manufacturing would be performed in the United States; and (3) through import violations by importing products with no marking of the country of origin. At trial the Government changed its theory, conceding Defendant did not enter into any supply

contracts with local governments, did not tell local governments that core processes were performed in the United States, and turbo blowers *did* contain markings and though those markings did not identify Korea as the shipper the papers included with the turbo blowers did.

Thus, for similar reasons as with the Grand Jury, the Republic of Korea was also misled when it agreed to extradition. In *United States v. Rauscher,* 119 U.S. 407, 430 (1886), the Supreme Court recognized and enforced the Rule of Specialty, which provides that a person brought within the jurisdiction of the court under an extradition treaty can only be tried for the offense with which he was charged in the proceedings for his extradition. *Rauscher* remains good law today. *See United States v. Stokes,* 726 F.3d 880, 889 (7th Cir. 2013), *citing United States v. Alvarez-Machain,* 504 U.S. 655, 659 (1992). *See also Gallo-Chamorro v. United States,* 233 F.3d 1298 (11th Cir. 2000) (rule of specialty requires the prosecution is based on the same set of facts set forth in the request for extradition). That requirement is an essential aspect of the treaty between the United States and the Republic of Korea. *See Extradition Treaty Between United States of America and Korea*, Article 15, https://www.state.gov/documents/organization/112483.pdf. (A person extradited may not be punished in the Requesting State except for an offense for which extradition was been granted or a differently denominated offense based on the same facts).

Accordingly, the Government engineered Defendant's extradition under false pretenses and his Indictment should have been dismissed.

10.     The Court erred when it denied Defendant's Motion to Dismiss the Indictment for being jurisdictionally defective. *See* Doc. #109, PgID #744, Doc. #109-1, PgID #758; Doc. #131, PgID #1040. Defendant re-raises the arguments made therein under both Rule 29 and 34.

22

Among other things Defendant had argued that the Court of International Trade (CIT) had exclusive jurisdiction to determine "substantial transformation." Under 28 USC § 1340 the district courts have original jurisdiction of any civil action *except* matters arising within the jurisdiction of the CIT, and under 28 USC § 1581 the CIT has exclusive jurisdiction of any civil action to review any findings made by the Secretary of the Treasury, rulings that would include substantial transformation. The Government argued that these acts limit the CIT's jurisdiction to civil cases and the instant proceeding is, quite obviously, criminal. The flaw in that argument is that Congress created a civil procedure to determine matters such as substantial transformation, and referred that process to courts specially prepared to make those findings. A federal criminal jury is ill-equipped to perform *ad hoc* review of these matters. The CIT's exclusive jurisdiction should have been invoked to obtain a ruling within that Court's expertise. James Schultz, from the United States Customs and Border Protection, testified that the agency had the ultimate authority to determine when a marking is correct. Only then should the United States be able to bring a criminal prosecution. Thus, jurisdiction did not exist and the Indictment should have been dismissed.

WHEREFORE, Defendant respectfully requests the Court enter an Order granting judgments of acquittal on all counts in the instant case.

Respectfully submitted,
HEON SEOK LEE

By:     /s/ Michael D. Monico
One of his attorneys

Michael D. Monico
Barry A. Spevack
Carly A. Chocron
MONICO & SPEVACK
20 South Clark Street, Suite 700
Chicago, Illinois 60603
312-782-8500

Attorneys for Defendant