UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 12 CR 109 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| HEON SEOK LEE | ) | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S RULE 29 AND RULE 34 MOTIONS

The United States of America by its attorney, Joel R. Levin, Acting United States Attorney for the Northern District of Illinois, respectfully submits this response to defendant Heon Seok Lee's motions under Federal Rule of Criminal Procedure 29 for a judgment of acquittal and Rule 34 for an arrest of judgment. *See* R. 185. For the following reasons, the government respectfully requests that the Court deny both motions.

## I. BACKGROUND

Defendant Heon Seok Lee was charged by indictment on February 16, 2012, with five counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1 through 5), and three counts of smuggling mismarked merchandise into the United States, in violation of 18 U.S.C. § 545 (Counts 6 through 8). R. 2. In 2015, the government obtained defendant's extradition from the Republic from Korea, and defendant then arrived in the United States. Defendant's trial on the charges contained in the indictment began March 6, 2017. After an eight-day trial, a jury returned verdicts of guilty on all counts of the indictment. Defendant has now moved for a new trial under Federal Rules of Criminal Procedure 29 and 34. *See* R. 185.

The trial evidence proved that, in an effort to combat the Great Recession of 2008, Congress passed the American Recovery and Reinvestment Act of 2009 ("ARRA"). Under ARRA, billions of dollars in stimulus funds went in a number of different directions and included the disbursement of funds to municipalities and other local governments for the construction and renovation of wastewater treatment facilities through clean-water revolving loans and grants administered by states and the EPA. In order to receive ARRA funding to upgrade/improve wastewater treatment facilities, municipalities had their general contractors and engineering firms confirm that the contractors, subcontractors, and vendors provided manufactured goods that complied with the "Buy American" provision in ARRA, which required that manufactured goods be "substantially transformed" in the United States of America. General contractors and engineering firms complied by using ARRA certificates, which were typed documents signed by representatives from subcontractors and vendors, in which the subcontractors and vendors confirmed that they would comply with the requirements of ARRA for the manufactured goods for the projects. The general contractors and engineering firms collected these certificates from subcontractors and vendors, and, when necessary, provided them to the municipalities to confirm ARRA compliance. The federal EPA, in turn, conducted audits and reviewed the certificates.

Defendant was the president and CEO of KTURBO and KTURBO USA (collectively, KTURBO). He started, ran and exercised managerial control over both companies. He designed and managed the design of KTURBO's primary product and

its technology, which consisted of an aeration blower. KTURBO originated in the Republic of Korea, where defendant had his main offices, his assembly and manufacturing plant, and over 100 employees. Defendant eventually decided to expand operations to the United States where defendant chose to enter the municipal wastewater treatment market.

As the evidence at trial established, defendant sought to fraudulently obtain federal stimulus funds that had been distributed to states and municipalities through ARRA. Defendant, through KTURBO, bid on and won contracts to provide blowers for placement in municipal wastewater treatment facilities and, along the way, falsely represented that KTURBO's aeration blowers would be and were substantially transformed in the United States. In truth, as defendant knew and directed, KTURBO fully assembled its blowers in the Republic of Korea, but nonetheless placed placards stating the blowers were "Assembled in USA", *then* shipped the fully-assembled blowers from South Korea to the United States, for distribution to municipalities across the country, including Indian Springs, Nevada; Lowell, Massachusetts; Mishawaka, Indiana; Ottawa, Illinois; Pendleton, Oregon; and South Burlington, Vermont.

To accomplish the fraud, defendant set up a small warehouse and office space in Batavia, Illinois, where defendant hired a handful of employees to work as sales representatives and putative assemblers. Defendant and his employees then represented that KTURBO would use this Batavia facility to manufacture and assemble aeration blowers using parts sourced from domestic and foreign suppliers

3

for municipal wastewater treatment plants. In truth, defendant saw that manufacturing and assembling blowers in the United States was too costly and took too much time in his opinion, leading defendant to decide to have blowers fully assembled and tested in South Korea, then shipped to the Batavia facility for a short period of time before shipment to municipal wastewater treatment plants across the country.

The trial evidence further established that defendant and others working with him and at his direction lied to sales representatives, who helped sell KTURBO blowers for ARRA projects, as well as general contractors, project engineers, and municipalities who bought aeration blowers from KTURBO, believing and trusting that that defendant and KTURBO complied with ARRA. Defendant and his employees continuously lied that blowers were assembled in the United States and purposely hid the fact that blowers were coming fully assembled from Republic of Korea. These lies even made their way to the nameplates welded and riveted on the blowers shipped from Korea, each of which falsely proclaimed, "Assembled in the USA."

On February 24, 2011, law enforcement, pursuant to a search warrant authorized by a magistrate judge in the United States District Court for the Northern District of Illinois, searched KTURBO's facility in Batavia, Illinois, seizing blowers that had been fully manufactured in the Republic of Korea as well as other relevant evidence. A short time after the search, defendant returned to the Republic of Korea, where he remained until the government obtained his extradition.

4

## II. LEGAL STANDARD

### A. Federal Rule of Criminal Procedure 29

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a guilty verdict against a defendant. FED. R. CRIM. P. 29. A defendant faces "a nearly insurmountable hurdle" in contending that the jury had insufficient evidence to find him guilty. *United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015) (internal marks omitted). In reviewing a motion for a judgment of acquittal, this Court reviews the evidence presented to the jury in the light most favorable to the government and makes all reasonable inferences in the Government's favor. *See United States v. Cejas*, 761 F.3d 717, 726 (7th Cir. 2014) (citing *United States v. Larkins*, 83 F.3d 162, 165 (7th Cir. 1996)). This Court may overturn the jury's guilty verdict "only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (internal marks omitted). It was the jury's role to weigh the evidence and assess the witnesses' credibility; courts do not "second-guess the jury's assessment of the evidence." *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008).

### B. Federal Rule of Criminal Procedure 34

Under Rule 34(a) of the Federal Rules of Criminal Procedure, "the court must arrest judgment if the court does not have jurisdiction of the charged offense." This infrequently used rule focuses on purely legal issues, rather than the evidence adduced at trial. *See United States v. Boender*, 719 F. Supp. 2d 951, 953 (N.D. Ill. 2010), aff'd, 649 F.3d 650 (7th Cir. 2011).

## III. DEFENDANT'S MOTIONS FOR ACQUITTAL AND ARREST OF JUDGMENT LACK MERIT.

### A. Application of the Recovery Act to Defendant and KTURBO

Defendant has argued in his motion and previously throughout the pendency of this case that ARRA did not apply to him and KTURBO.[1] *See* R. 185 at 2. Consequently, defendant now argues that, if KTURBO was not subject to ARRA, "then it is hard to conceive how [d]efendant could have committed a crime." *Id.* at 3. These claims misapprehend ARRA, the application of ARRA to defendant and KTURBO, as well the statutory violations charged against defendant.

The indictment did not allege that defendant committed a substantive violation of ARRA, nor did it charge that he violated federal regulations implemented pursuant to ARRA. Instead, defendant was charged with violating the federal wire fraud statute, *see* 18 U.S.C. § 1343, which required proof that defendant participated in a scheme to defraud, the defendant did so with intent to defraud, the scheme involved materially false or fraudulent representations, and that the defendant caused interstate wire communications to take place. *See* R. 164 at 17 (7th Circuit Pattern Criminal Jury Instruction on § 1343 violation); *United States v. Faruki*, 803 F.3d 847, 852 (7th Cir. 2015) *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009).

---

[1] Defendant has claimed that the Court "predetermined" this issue through its pretrial rulings, *see* R. 185 at 3, but that claim lacks merit. The Court simply followed the applicable law and made rulings consistent with the law. Any claim that the Court was biased against the defendant or had a predetermined view of the case lacks support in the record.

In an effort to squeeze his theory into the elements of wire fraud, defendant argues "[t]here could be no scheme outside the parameters of ARRA. If ARRA did not apply, a scheme to defraud could not exist." R. 185 at 5. That argument lacks merit. As the Court properly instructed the jury, the scheme to defraud simply meant a scheme "intended to deceive or cheat another …." *Id.* at 18. Neither that element, nor any other element of the fraud charge required proof that defendant was a recipient or sub-recipient of ARRA stimulus funds, let alone proof that defendant directly received ARRA funding from the federal government.

While ARRA was not an element of the offense charged against the defendant, the application of ARRA and its Buy American provision was relevant at trial to give context to the false representations that defendant and those acting with him and at his direction made. Specifically, as the evidence at trial revealed, municipalities, their engineering firms, and their general contractors needed to comply with ARRA's Buy American provision in order to receive federal stimulus funds for improvements to municipal wastewater treatment plants. As representatives from a number of municipalities and their general contractors as well as certain engineering firms testified at trial, each expected their vendors and subcontractors—including KTURBO—to provide goods and services that complied with ARRA's Buy American provision. Defendant and his employees confirmed these representatives' expectations with numerous representations regarding KTURBO's compliance with the Buy American provision of ARRA, including specific representations that KTURBO would assemble its blowers in the United States using parts sourced from

domestic and foreign suppliers. These representations appeared in contracts, email communications, signed certifications, conversations, and presentations. Put simply, defendant and his employees willingly chose to represent that their business practices conformed to the requirements of ARRA, including its Buy American provision, in order to gain a stronger foothold in the United States aeration blower market. It was defendant who made that choice and he subsequently held KTURBO out as compliant with the law. He cannot now unring that bell, particularly after the jury has considered, weighed, and determined that defendant did, in fact, make false representations regarding KTURBO's compliance with ARRA and the Buy American provision.

Defendant has also challenged the evidence at trial regarding his intent, but those challenges also lack merit. Defendant first argues that there was no evidence that he "knew when he contracted with the project contractors that the Government was going to rely on anything he said with respect to an intent to provide blowers that were ARRA complaint when the time came for delivery." R. 185 at 3-4. This argument mistakes the applicable legal standard. To prove wire fraud, the government need not establish defendant's intent to violate the wire fraud statute; the government need only prove "that a defendant intended for his or her scheme to defraud someone[.]" *United States v. Marr*, 760 F.3d 733, 744 (7th Cir. 2014).

To the extent defendant suggests he did not know that his representations regarding ARRA compliance were important to the EPA and the municipalities receiving ARRA funding, that claim is belied by the evidence at trial. Through the

first-hand observations of witnesses and defendant's own PowerPoint presentation, the evidence established that, in November 2009, defendant invited the EPA and municipal representatives to his office in Batavia, Illinois, for an in-person presentation during which defendant gave a PowerPoint presentation detailing how KTURBO would assemble blowers from parts sourced from domestic and foreign suppliers. Likewise, the ARRA certificates signed by defendant and others working with him identified the municipalities where the blowers were being sent and indicated that the blowers would comply with the requirements of the Buy American provision. Email communications between defendant and his fellow employees (including his sister) further established defendant's knowledge of the government's role in ARRA oversight, as well as the regulatory framework that he was subjecting himself to by holding KTURBO out as compliant with ARRA.

During trial, witnesses, namely, people formerly employed by KTURBO USA testified about their interactions with defendant, their understanding of the requirements of ARRA based on their employment at KTURBO USA, as well as their observations of how fully-assembled blowers were shipped from KTURBO's Korean facility to the Batavia facility for ARRA projects contrary to the representations KTURBO made to customers. Defendant challenges the value of the testimony by these former employees, arguing that "their misapprehensions over whether ARRA applied has no evidentiary value. Their testimony does not make something true when in reality it wasn't." R. 185 at 4. This argument misses the mark. The testimony of former employees, including Joel Schomo, John Jansouzian, and Kim Woelffer,

about their understanding of ARRA, the Buy American provision, and their understanding of what they understood those provisions to require of KTURBO gave relevant context to the jury for (a) what the defendant knew, (b) what he discussed with his employees, (c) how he was aware of the requirements of ARRA, and (d) how he purposely flouted those requirements even after his employees came to him with their concerns. It was the province of the jury to weigh, consider, and find credible these witnesses' testimony; defendant's second-guessing post-conviction is unavailing. *See United States v. Reed*, 875 F.2d 107, 111 (7th Cir. 1989).

Defendant also relies on the Second Circuit's decision in *United States ex rel. O'Donnell v. Countrywide Home Loans*, 822 F.3d 650 (2d. Cir. 2016), in an effort to seek acquittal, but that reliance is misplaced. That case, as the Court knows from pretrial motion practice, stands only for the noncontroversial proposition that fraud cannot be "based solely on contractual breach," where "the *only* representations involved in th[e] case are contained within contracts" and there is no proof that the defendant "made any later misrepresentations—i.e., ones not contained in the contracts—as to which fraudulent intent could be found." *Id.* at 656, 658, 663. The Second Circuit explained that its holding did not extend to cases, like this one, where the defendant "made affirmative fraudulent misrepresentations to their contractual counterparties in the course of performance or to feign performance under the contract." *Id.* at 658; *see also id.* at 661 n.12.

Specifically, the jury received evidence that defendant and his employees made intentionally false misrepresentations throughout the course of the scheme, contrary

to defendant's suggestion that the statements about ARRA compliance were confined to a six-month period. *See* R. 185 at 4. For instance, as early as November 25, 2009, one of defendant's employees sent an email to Shawn Clark, a West Coast sales representative who worked on the Pendleton project, and included defendant on the email, in which the employee stated, "KTurbo meet [sic] the ARRA requirements. Please find attached document for ARRA requirement." Gov. Ex. 907. Attached to the email were photographs of the Batavia facility exterior and interior, as well as photographs of the Korean manufacturing facility where blowers were *actually* being manufactured, which the jury was entitled to consider as included by the employee in order to give the false impression that the Batavia facility had the capacity to assemble blowers at that time. Another example is the email communication employee Joel Schomo sent to Ottawa's engineering firm on January 10, 2011, providing a certification signed by Trinity Lee (defendant's sister and coconspirator) that falsely represented, "All of the manufacturing processes for Ottawa project will be done within the united states [sic] except for the following. … All assembly of the completed unit will be executed domestically. … The domestic manufacturing/assembly process on average takes 40 man/hours to complete." Gov. Ex. 606 at 3. As the evidence demonstrated at trial, these false representations occurred months after defendant made the decision to discontinue KTURBO's relationships with domestic suppliers of blower packages (like Tru-Way, as a representative from that company testified), and after defendant made the decision to ship blowers fully assembled from Korea to the Batavia facility in order to save

time and money. Indeed, the evidence demonstrated that the Ottawa blowers arrived fully assembled in the United States on January 4, 2011, days before the false representations were made. *See* Gov. Ex. 205. Furthermore, defendant himself made false representations during the course of the scheme, including an email communication dated January 28, 2011, when defendant was asked by a sales representative whether KTURBO was having "any issues with ARRA oversight …." Gov. Ex. 137. Defendant lied in response, stating, "It depend [sic] on project requirement. Most important parts is final assembly and testing. We are doing those. So, we are compliant." *Id.*

Unlike in *Countrywide*, the jury in this case received extensive evidence of material omissions and active concealment by defendant and his employees, which appropriately forms the basis for a wire fraud violation. *See Countrywide*, 822 F.3d at 665, n.18 ("As we noted above, the jury was not charged as to—and therefore could not have found—liability as a result of fraudulent silence."). Specifically, the jury heard and credited the testimony of former employee John Jansouzian, who testified he was hired to assemble blowers for KTURBO at the Batavia facility, but he only ended up testing blowers that were shipped fully assembled from Korea. *See* Tr. 518-21. Jansouzian testified that he told the defendant that the blowers arrived fully assembled and defendant instructed him to not tell customers that they had not been built in KTURBO's shop. *See* Tr. 521. As the Seventh Circuit observed in *United States v. Biesiadecki*, 933 F.2d 539, 543 (7th Cir. 1991), "[w]e held in *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir.1985), that 'omissions or concealment of

material information can constitute fraud ... cognizable under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation.'" The Seventh Circuit confirmed this principal in *United States v. Palumbo Bros.*, 145 F.3d 850, 868 (7th Cir. 1998), where it held that "mail fraud applies broadly to schemes that deprive individuals of money by making a false statement, or providing a half truth that is misleading, expecting that individual to act upon it to his detriment. We also have determined that the omission or concealment of material information, even when a statute or regulation does not impose a duty to disclose, constitutes mail fraud." (internal citations omitted).

In summary, the evidence presented at trial established beyond a reasonable doubt that defendant intentionally participated in a scheme to defraud customers regarding the location of manufacturing for KTURBO blowers in order to obtain contracts and payment for those blowers, using materially misrepresentations, the omission of material facts, as well as through the active concealment of facts, and in the course of the scheme caused email communications (wire transmissions) to be sent in furtherance of the scheme. Defendant's request for judgments of acquittal on Counts One through Five should be denied accordingly.

### B. The Republic of Korea's Participation in the World Trade Organization Does Not Bar Defendant's Wire Fraud Convictions.

There is no merit to defendant's claims that the World Trade Organization Government Procurement Agreement stand in the way of the jury's findings of guilt on the wire fraud charges. *See* R. 185 at 7-8. The WTO did not apply, and it did not

13

exempt the defendant or KTurbo from complying with the Recovery Act's "Buy American" requirements.

ARRA prohibited the use of stimulus funds unless all of the iron, steel, and manufactured goods used in the project were produced in the United States and that this "Buy American" provision was to be applied in a manner consistent with United States obligations under international agreements. According to implementing regulations, the Buy American provision did not apply where the iron, steel or manufactured goods were from a party to an international agreement that obligated the recipient to treat the goods and services of that party the same as domestic goods and services. Because South Korea was a designated country in the World Trade Organization Government Procurement Agreement, the United States government, which was also a designated country in the WTO Government Procurement Agreement, was required to treat manufactured goods from Korea as domestic goods when procuring such goods. *See* Revised Agreement on Government Procurement, Apr. 2, 2012, art. IV, 33 I.L.M. 1125.

As the Court is aware, however, the federal government has the constitutional authority to create binding foreign treaties, while each state is allowed to limit the application of an agreement to certain agencies and to exclude the purchase of particular goods or services. *See* Kevin McNiff, *The Use of Federal Grant-Making Power To Expand State and Local Procurement Coverage Under the Transatlantic Trade and Investment Partnership*, 44 Pub. Cont. L.J. 327, 332-333 (Winter 2015). When the United States government entered into the WTO Government Procurement

14

Agreement, only thirty-seven states agreed to grant parties to the agreement access to some of their procurement markets, and those states reserved the right to discriminate against foreign contractors on public utilities projects. *Id*. But none of the municipalities at issue in this case were parties to the WTO Government Procurement Agreement. Because the municipalities were not parties to the agreement, they were obligated to use stimulus funds pursuant to the terms of ARRA and the WTO did not apply. Tellingly, none of the certifications, representations, and communications issued by defendant and his employees during the scheme invoked the WTO and not one even suggested that the WTO applied.

### C. Defendant's Substantial Transformation Argument Lacks Merit.

There is no merit to defendant's argument that KTURBO satisfied the requirements of substantial transformation in the United States for the municipal wastewater treatment projects discussed during trial. *See* R. 8-13. During trial and now post-trial, defendant argues that KTURBO complied with two of the five criteria for substantial transformed articulated in EPA guidance. That argument was necessarily rejected by the jury, as it found that defendant participated in a scheme to defraud involving false representations regarding ARRA compliance and compliance with the Buy American provision. Unhappy with the jury's findings, defendant now asks for the evidence to be reweighed and for his argument to be accepted. That effort should be rejected by the Court.

For instance, defendant wrongly points to the entire project as being the good or service that needed to be substantially transformed in the United States. The representations by defendant and his employees referred to the blower—not the

entire wastewater treatment project—when discussing substantial transformation with customers and in their presentations and pitches to obtain business. There was no evidence that defendant, during the scheme, believed anything else to be true as reflected in his numerous email communications and oral communications in which he specifically discussed blowers as being substantially transformed at the Batavia facility, not the entire projects. Indeed, defendant's own PowerPoint presentation, in which defendant claimed that the blowers' ingot, rotor, packaging, pipes, silencer, check valve, isolation valve, power-in assembly, control assembly, air and harmonic filters (reflecting 40% of cost) would be made in America, while the motor assembly, VFD assembly, and blow-off valve (reflecting 50% of cost) would be imported from Korea, with the assembly and testing of the blowers by American labor would complete the project (and account for 10% of cost). *See* Gov. Ex. 103 at 46. That PowerPoint also provided a diagram identifying which parts were to originate domestically and abroad. *See id.* at 44.

Likewise, defendant's arguments about testing and assembly of the blowers on site was belied by the credible and reliable evidence presented at trial. During the government's case-in-chief, the jury received evidence that (a) blowers were fully assembled in Korea before they arrived at KTURBO's Batavia facility; (b) the blowers had hours of run-time on them when they arrived, indicating that they had been operated in Korea before shipment; (c) the blowers had been tested prior to shipment from Korea, as reflected in email communications to municipal representatives; and

16

(d) the municipalities, including their general contractor and engineering firm, were responsible for installation of the blowers upon arrival, not KTURBO.

Defendant has also reargued his claim that the grand jury was misled by the government. That claim, of course, has been litigated extensively during the pendency of this case with rulings adverse to defendant. Nothing defendant has argued post-trial changes that result. Indeed, as discussed below, the petit jury's finding of guilt renders any alleged error harmless beyond a reasonable doubt.

### D.    There Is No Merit to Defendant's Due Process Claim

Defendant argues that the term "substantial transformation" is unconstitutionally vague and cannot be a basis for a criminal conviction. *See* R. 185 at 13. That argument lacks merit and should be rejected.

To begin with, the vagueness doctrine applies to criminal statutes and, as discussed above, defendant was not charged with a regulatory violation of the Buy American provision. As the Seventh Circuit has held, a criminal statute "may operate in an unconstitutionally vague manner if it: 1) does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or 2) fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the statute." *United States v. Lim*, 444 F.3d 910, 915 (7th Cir. 2006). The Seventh Circuit has observed that this rule applies to criminal statutes, which must provide notice of the prohibited conduct to 'a reasonable degree of certainty,' but 'the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions.'" *Id.* quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952). Moreover, as established at trial,

17

defendant and his employees did not simply represent that he would comply with the Buy American provision, nor did he and his employees simply represent that KTURBO would substantially transform blowers in the United States. Instead, they made specific representations regarding the level of assembly, manufacturing, and sourcing of parts that would comprise each blower, *see, e.g.*, Gov. Exs. 103, 137, 606.

### E. The Evidence Sufficiently Established Defendant's Violation of 18 U.S.C. § 545.

Defendant challenges his conviction on Counts 6 through 8 of the indictment, which charged him with violating 18 U.S.C. § 545, which requires the government to prove (1) that defendant imported or brought into the United States merchandise; (2) the importation or bringing into the United States of the merchandise was contrary to law; and (3) defendant acting knowingly or fraudulently.

First, defendant claims the second element was not satisfied because the "evidence was that the articles were marked," specifically claiming, that the "statute was not violated by the mis-marking and clearly there was no intent to violate the statute given the fact that the papers accompanying the shipments identified they had been imported from Korea." R. 185 at 15-16. To begin with, defendant offers no precedent for his claim that § 1304 only applies to unmarked goods and not mismarked goods. A plain reading of the statute, which is the first step in statutory interpretation, establishes that the statute covers both unmarked and mismarked goods as the statute requires that goods be marked "to indicate … the English name of the country of origin of the article." 19 U.S.C. § 1304(a). Regardless of whether a good is unmarked or falsely identifies the country of origin, the ultimate purchaser

18

has been misinformed. If anything, when defendant and his employees falsely marked the blowers (which were plastic-wrapped and placed inside opaque wooden crates) and then identified on the shipping documentation that the blowers originated in Korea, this latter step is reasonably viewed as an attempt by defendant and his employees to ensure that customs inspectors would not open the crates to conduct a further inspection into how the blowers were marked.

Second, defendant wrongly argues that defendant and KTURBO USA were the ultimate purchasers of the blowers imported from Korea. *See* R. 185 at 16. Defendant requested and the Court gave the jury an instruction on the definition of an ultimate purchaser, which was "generally the last person in the United States who will receive the article in the form in which it was imported." R. 164 at 33. As the evidence established at trial, aeration blowers for ARRA-funded projects had no work done on them at KTURBO's Batavia facility before being shipped to municipal wastewater treatment facilities. No substantial transformation of the blowers occurred at the Batavia facility or on-site that could have turned defendant and KTURBO USA into "ultimate purchasers."

### F. Defendant's Claim of Grand Jury Misconduct Should Be Rejected.

Defendant reargues his claim that the government presented misleading evidence to the grand jury prior to indictment. *See* R. 185 at 17-20. Even assuming for the sake of argument that grand jury error occurred, the petit jury's finding of guilt against defendant on all counts of the indictment renders any alleged error harmless beyond a reasonable doubt.

19

As the Seventh Circuit has held, a petit jury's finding of guilt beyond a reasonable doubt demonstrates probable cause to return an indictment, regardless of alleged misconduct before the grand jury. *United States v. Mechanik*, 475 U.S. 66, 72-73 (1986). In other words, defendant's conviction renders harmless any "conceiveable error in the charging decision" before the grand jury. *Id.* at 73. For example, in *United States v. Vincent*, 416 F.3d 593 (7th Cir. 2005), a defendant convicted at trial of mail and wire fraud charges claimed that perjury before the grand jury required dismissal of the charges against him. Applying *Mechanik*, the Seventh Circuit held: "Even if errors in the grand jury proceedings would have justified the district court in dismissing the indictment prior to trial, the petit jury's subsequent conviction of [defendant] rendered these errors harmless beyond a reasonable doubt." *Id.* at 601; *see also United States v. Morgan*, 384 F.3d 439, 443 (7th Cir. 2004) (holding that a petit jury's conviction rendered harmless any error from alleged perjury during grand jury proceedings).

The only "prejudice" defendant could possibly complain is that he had to stand trial and was ultimately convicted; this, of course, is insufficient to afford him relief. Thus, the petit jury's conviction of defendant on the wire fraud counts rendered the claimed error of prejudice before the grand jury harmless beyond a reasonable doubt.

### G. Defendant's Motions to Dismiss Continue to Lack Merit.

In cursory fashion, defendant incorporates by reference his prior arguments in support of his motion to dismiss, which the Court previously denied. Defendant has not provided any additional facts, law or analysis that may support his arguments. Because defendant has not offered any meaningful reason or basis for the Court to

reconsider its prior rulings, his motions should be denied. *See United States v. Mojica*, No. 12 CR 755-5, 2016 WL 3268991, at *3 (N.D. Ill. June 15, 2016).

### H.   The Government Did Not Violate the Rule of Specialty.

According to defendant, the government changed its theory from extradition to trial, violating the rule of specialty. R. 185 at 21-22. As an initial matter, defendant lacks standing to bring this claim. *See United States v. Burke*, 425 F.3d 400, 408 (7th Cir. 2005) ("[E]xtradition treaties do not create personal rights enforceable by criminal defendants.... Instead they create rules for the relations between nations."); *but see United States v. Stokes*, 726 F.3d 880, 888-89 (*citing United States v. Rauscher*, 119 U.S. 407 (1886)). As the Seventh Circuit previously held, a defendant lacks "standing to challenge violations of international treaties in the absence of a protest by the sovereigns involved." *Matta-Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir. 1990). In this case, defendant has presented no evidence of any protest from the Republic of Korea and thus he lacks standing to raise a challenge under the extradition treaty. *See United States v. Nduribe*, 14 C 525, 2014 WL 1856761, at *2 (N.D. Ill. May 6, 2014) (Der-Yeghiayan, J., presiding); *United States v. Stokes*, 2010 WL 1874281, at *3 (N.D. Ill. May 10, 2010) (Pallmeyer, J., presiding).

Second, defendant's claimed violation of the rule of specialty fails on the merits. Under the rule of specialty, an extradited defendant may only be prosecuted for the specific crimes for which he was extradited. *United States v. Warda*, 285 F.3d 573, 575-76 (7th Cir.2002) ("[T]he Rule of Specialty ... does not allow the country to which an individual is extradited to prosecute that person for a crime unless the extraditing nation has expressly authorized such a prosecution."). In this case, the government

21

sought defendant's extradition on the same charges presented to the jury in this case. The only difference was immaterial; the Court granted the government's motion to strike an allegation in the indictment regarding loss, which the Court properly held was surplusage and not an element of the offense charged in Counts 1 through 5.

## I. Defendant's Jurisdictional Claims Continue to Lack Merit.

Defendant remakes his prior argument that this Court lacks jurisdiction over the his criminal violations of 18 U.S.C. § 545, which are based on 19 U.S.C. § 1304. See R. 185 at 22-23. This argument has been addressed by the Court and rejected. *See* R. 142. Defendant provides no basis for the Court to revisit its ruling and the motion should remain denied.

## IV. CONCLUSION

For the reasons stated herein, the government respectfully requests that the Court deny defendant's motions under Federal Rules of Criminal Procedure 29 and 34.

Respectfully submitted,

JOEL R. LEVIN
Acting United States Attorney

By:     *s/ Patrick M. Otlewski*
PATRICK M. OTLEWSKI
MEGAN CUNNIFF CHURCH
Assistant U.S. Attorneys
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-5300

Dated: July 14, 2017